## No. 6532.

### JOHN I. ADAMS & Co. vs. THOMAS J. DAUNIS ET AL.

National banks, like any other corporations, and the receivers of the same, may sue, and be sued, in the State courts of their domicile.

Where a conflict of privileges on certain property arises, the claims, no matter who the claimants are, must be transferred to, and passed on, by the court, under whose mandate the property was first seized.

The mortgage and judgment creditors, and the purchaser of the mortgage property at judicial sale of the property, can not, by their conventions, perpetuate a judicial mortgage, after the judgment has been extinguished on which the mortgage founded.

A third person can not be affected by any notice of a mortgage, except the notice conveyed to him by the *inscription* of the mortgage. All are third persons, except the parties.

The *inscription* of a mortgage, after the lapse of ten years from the date of *inscription*, unless reinscribed, is utterly void as to third persons, and is no longer any *proof* of the mortgage, even between the parties to it.

APPEAL from the Fifteenth Judicial District Court, parish of Lafourche. *Beattie, J.*

*Clay Knobloch*, for plaintiffs and appellees.

*J. D. Rouse* and *Andrew J. Murphy*, for N. W. Casey, receiver.

The opinion of the court was delivered by

MARR, J.   On the twenty-fourth of February, 1860, Tucker Brothers

executed a mortgage, which was recorded on the same day, on a plantation in the parish of Lafourche, in favor of Robert Tucker or any future holder, to secure four promissory notes for five thousand dollars each, of which two only seem to have been used.

The Bank of New Orleans held one of these notes, and Godfrey Barnsley held the other. The bank obtained judgment against Tucker Brothers on the note held by it, with recognition of the mortgage, which was recorded as a judicial mortg    e on the twenty-eighth of June, 1867. Barnsley brought suit on the note held by him, which was not prosecuted to judgment; and it seems to have been discontinued.

Execution issued on the judgment in favor of the bank, under which the sheriff seized the mortgaged property, and sold it on the seventh of September, 1867, to A. W. Cummings, for cash.

The first mortgage in date bore on part only of the property, and was in favor of Gaubert and Richard, who had obtained judgment against Tucker Brothers for the amount due them, which was recorded as a judicial mortgage on the fourteenth of July, 1866; and the next in rank was that under which the bank and Barnsley claimed. The price of the adjudication was not sufficient to pay the amount due these creditors in the second rank. Of course the junior mortgagees were cut off, and the creditors in the first and second ranks were the only persons who were interested in the distribution of the proceeds of the sale.

The sheriff, in his return, after the usual recitals, states that the property was adjudicated to the last and highest bidder, A. W. Cummings, "for and in consideration of the sum of thirteen thousand and twenty-five dollars, PAID *as follows*, to wit:

"First—The purchaser retained in his hands the sum of $1851 10," the amount due to the first mortgage creditors, Gaubert and Richard, "which amount *remained secured by same mortgage*."

"Second—The balance of adjudication, $11,173 90, *is applied* to the settlement of the claim of the plaintiff and Godfrey Barnsley, each holding a five-thousand-dollar note, secured by the second mortgage * * * in the following proportions, the fund being insufficient to extinguish these claims, viz.: to the bank, to cover principal, interest, and costs, *pro rata*, $6269 50; to G. Barnsley, *pro rata*, $4904 40; as will more fully appear by act of compromise and agreement between the parties, etc."

The agreement referred to in the return is of the same date as the sale. It begins with the declaration by Cummings "that he has this day purchased at sheriff's sale, in the case entitled the Bank of New Orleans vs. Tucker Brothers, for cash"; and then follows a description of the property and statement of the price of the adjudication. The agreement then recites: "That the purchase price was not in reality paid in cash; but the purchaser compounded and compromised with the mort-

gage creditors hereinbefore named, who agree to give him time, *without,* however, *impairing or novating their original claims, the right to enforce which they expressly reserve.*"

The payments were to be in three installments. With respect to Gaubert and Richard, declared to be the creditors first in rank, after dividing the $1851 10, to be paid them, into three parts, as agreed upon, and fixing the dates from which they are respectively to bear interest, the agreement states :

" t is distinctly understood, however, that if any of these installments should not be paid at maturity the whole amount shall be exigible, and Gaubert and Richard shall be and are hereby authorized and expressly empowered to enforce the aforesaid judgment in case No. 487 on the tract to them mortgaged specially by privilege, the said Cummings binding himself to interpose no objection or obstacle thereto."

After dividing the $4905 40 to be paid to Barnsley and the $6269 50 to be paid the bank into three parts each, and fixing the dates of payment and the time from which they are to bear interest, the agreement proceeds :

"It is understood, as above stated, that the parties hereto do not by these presents impair, affect, or novate their existing claims, and that in case of non-payment they will be entitled to enforce the judgments which may be held by them, and, furthermore, that the *original mortgages and privileges remain in full force and effects, and are not hereby novated,* and, if need be, for the purpose of avoiding all doubt the said privileges and mortgages are hereby recognized as operating on the said property *in the proportions aforesaid* and to secure the debts aforesaid, with the rank above stated.

"The mortgage of the said Barnsley and the bank results from an act executed before the undersigned recorder on twenty-fourth February, 1860, inscribed in this office on the same day, as will more fully appear by suit No. 578, entitled Bank of New Orleans vs. Tucker Brothers, and No. 793, entitled Godfrey Barnsley vs. Tucker Brothers, on file in the Third District Court of Lafourche."

This agreement was recorded in the book of conventional mortgages on the day of its date, seventh September, 1867.

Pursuant to the sale and adjudication of the seventh September, the sheriff on the ninth September made a deed to Cummings, in which he recites all that he had done touching the sale, and copies his return in full. He then proceeds to "sell, set over, transfer, and convey unto the purchaser, A. W. Cummings, for the sum above stipulated *and* PAID as aforesaid, all the rights, title, and interest which defendants, Tucker Brothers, had in or on the aforesaid property."

The sheriff treated the sale as having been made for cash, and reserved

no mortgage on the property. The deed was registered on the thirtieth September in the book of conveyances.

In December, 1868, Cummings sold the property to Mrs. Tucker, who assumed to pay the debts for which Cummings had bound himself; and on the same day she sold half of it to Thomas J. Daunis, with whom she formed a planting partnership. Daunis assumed the same debts, but neither he nor Mrs. Tucker gave any mortgage to secure the payment.

On the second of April, 1870, Daunis and Mrs. Tucker mortgaged the property to John I. Adams & Co., and on the first of April, 1871, Mrs. Tucker sold her half to Daunis, who assumed all the debts for which she had bound herself, but he gave no mortgage to secure the payment.

On the twenty-fifth of July, 1875, Adams & Co. required the recorder to cancel and erase the inscription of the conventional mortgage of the twenty-fourth of February, 1860, on the ground that more than ten years had elapsed after the date of this inscription when they on the second of April, 1870, acquired their mortgage on the property, and this inscription had not been renewed.

The recorder complied with this demand, as he was bound to do by the act of 1843, Revised Statutes, sections 450, 3141, amending article 3333, now article 3369, of the Civil Code; and on the twenty-eighth of July Adams & Co. proceeded against Daunis on their mortgage by seizure and sale. The property was sold on the second of October, 1875, and the mortgagees became the purchasers for some $17,519, less than half the mortgage debt due them. The sheriff refused to complete the adjudication without payment of certain mortgage claims against Tucker Brothers, among others that of the Bank of New Orleans, resulting from the judgment recorded on the twenty-eighth of June, 1867.

Adams & Co. then took a rule on the recorder; N. W. Casey, receiver of the New Orleans National Banking Association, the successor of the Bank of New Orleans; Goodrich & Co., R. & E. L. Tanner, Gaubert and Richard, and the sheriff: the recorder and the several creditors to show cause why the mortgages appearing in the names of these creditors, respectively, in so far as they affect the property in question, should not be canceled and erased; and the sheriff to show cause why he should not complete the adjudication, and put the purchasers in possession.

Casey alone appeared and contested this rule. He pleaded want of jurisdiction; and that the proper and necessary parties were not before the court. He also pleaded a general denial; and set up the judgment against Tucker Brothers in favor of the Bank of New Orleans, recorded as a judicial mortgage on the twenty-eighth of June, 1867, which he alleged had not been paid, and was in full force.

The judgment of the court below made the rule absolute, and ordered the recorder to cancel and erase the several mortgages specified

Adams & Co. vs. Daunis.

in the rule, and in accordance with its terms; and the sheriff to complete the adjudication, and to put the purchaser in possession. From this judgment Casey took a devolutive appeal.

The plea to the jurisdiction is twofold: 1. That the national banks can not be sued in a State court, except in the county or parish in which they are located. 2. That the rights of the bank can not be determined on a rule, but only by direct action.

First—As to this latter objection, it suffices to say that in such a case as this the law requires the proceeding to be summary. Code of Practice, 754, 755; Revised Statutes, sections 1942, 2903.

Second—The other plea to the jurisdiction is based upon section fifty-seven of the national bank act, which was omitted in the Revised Statutes of the United States; but is to be found in the appendix, p. 1437, as an amendment to section 5198, as follows:

"Suits, actions, and proceedings against any association under this title may be had in any circuit, district, or territorial court of the United States, held within the district in which such association may be established, or in any State, county, or municipal court in the county or city in which said association is located, having jurisdiction in similar cases."

We do not understand this section as excluding all other jurisdictions than those specified. The State courts derive their jurisdiction from State law, not from the laws of the United States ; and we must look to the State law to ascertain whether a State court has jurisdiction in any given case, except where exclusive jurisdiction is given to the Federal tribunals by the constitution and laws of the United States.

Section 5136 of the Revised Statutes, section eight of the National Bank act, authorizes the banks "to sue and be sued, complain and defend, in any court of law and equity, as fully as natural persons." That is, these banks are corporations, and they proceed and are proceeded against as other corporations. Once vested with this power and capacity, they are amenable to the jurisdiction of the courts of the States in which they are respectively located, just as other corporations or natural persons are; and section fifty-seven of the bank act is merely declaratory, and was not intended as an abridgment of the power and jurisdiction of the State courts, touching property or persons, natural or corporate, within their territorial limits. Of course these corporations, just as natural persons, may have causes in which they are parties heard and determined in the Federal courts, either on original process or by removal in the cases provided by the laws of the United States.

In Louisiana the jurisdiction of the courts depends upon the subject matter in controversy and the domicile of the defendant. The New Orleans National Banking Association had its domicile at New Orleans; and, in an ordinary civil case, it could not have been sued out of the parish of Orleans.

Casey, the receiver, has his domicile at the city of New Orleans; and in like manner he is not subject to the ordinary jurisdiction of the courts of other parishes.

The association was not made a party to this proceeding. The Bank of New Orleans no longer exists. It was converted into the New Orleans National Banking Association in 1871, and Casey, receiver of that association, administered the effects which formerly belonged to the Bank of New Orleans. If the association were a party it would be amenable to the jurisdiction of any State court in which a natural person, having his domicile at the city of New Orleans, could be sued. The case cited by appellant's counsel, Bank of Bethel vs. Pahquoique Bank, 14 Wallace, 383, simply decides that a national bank does not lose its corporate existence by the appointment of a receiver, and that it may still be sued, just as a natural person, in a court of the State, precisely as if a receiver had not been appointed.

The question in this case is not whether this national banking association may be sued in a State court after a receiver has been appointed; but whether, a receiver having been appointed, he is amenable to the jurisdiction of a State court in a parish different from that in which the association was located, and in which also he has his domicile.

By the act of 1841, re-enacted in 1855, p. 497, section thirty-seven, and again in the Revised Statutes of 1870, sections 1942, 2903: " Whenever a conflict of privileges arises between creditors, all the suits and claims shall be transferred to the court by whose mandate the property was first seized, either in mesne process or on execution, and the said court shall proceed to class the privileges and mortgages according to their rank and privilege *in a summary manner* after notifying the parties interested."

The whole controversy in this case is a conflict of privileges. The property was situated in Lafourche; it had been seized and sold under process of the district court of that parish, and no other court in the State had power or jurisdiction to settle the controversy, and to distribute the proceeds of the sale among the several creditors asserting mortgages and privileges against the property.

Third—The rule required certain persons to show cause why inscriptions of mortgages appearing in their names should not be canceled and erased. These persons were made parties by name, and they appear to have been notified. No other persons whomsoever were necessary parties, because the rights of no other persons were attacked or involved. If any person interested was not before the court, it will be his business to make that fact appear when his rights are affected; but it is not the business of a party who is properly before the court, and who asserts an independent, separate, and distinct right, which must be determined between him and the plaintiff.

Adams & Co. vs. Daunis.

It was proven on the trial that the debt due Gaubert and Richard had been paid in full; and that the judicial mortgages in favor of Goodrich & Co. and R. & E. L. Tanner were long subsequent in date to the conventional mortgage under which the bank claimed and the sheriff sold the property. None of these parties have appealed, and the judgment is unquestionably correct so far as they are concerned. · The only question is as to the right of the bank; and that depends upon the effect to be given to the conventional mortgage recorded on the twenty-fourth of February, 1860; the judicial mortgage recorded on the twenty-eighth of June, 1876; and the agreement with Cummings, recorded on the seventh September, 1867.

First—So far as the judicial mortgage is concerned, it is obvious that it was extinguished by the sale made under execution issued on the judgment. It was a judgment against Tucker Brothers, and their property was seized and sold in satisfaction of that judgment, and the price of the adjudication was apportioned and distributed by the sheriff among the several mortgage creditors, according to their rank and privilege respectively. It was not in the power of the bank, the seizing creditor, and one of the distributees of the proceeds of that sale, nor was it in the power of Cummings, the purchaser of the property, for cash, to revive that judgment, or to give force and validity to the judicial mortgage, the mere incident and accessory, after the judgment itself, upon which alone it depended, had been extinguished, *pro tanto*, as to the judgment debtors, by the sale of their property.

Second—The agreement between Cummings and the mortgage creditors was anomalous, and in some respects extraordinary. It is clear that Cummings did not grant any mortgage on this property, and as the title of the Tucker Brothers had been divested, and had vested in Cummings by the sheriff's sale, adjudication, and registered deed, the extraordinary circumstance is that these creditors of Tucker Brothers were so careful, took such pains to reserve their original rights, and to stipulate that they should, in case of default on the part of Cummings, enforce their original claims and mortgages against Tucker Brothers, and that these claims and mortgages were in no way impaired, or affected, or novated by the agreement made with Cummings.

Cummings did, indeed, recognize the original mortgages and privileges as operating on the property; but this recognition of mortgages granted by Tucker Brothers no more *created* a mortgage against Cummings than his recognition of the judgments against Tucker Brothers made him a party to the judgments and subjected him and his property to the process of execution as one of the judgment debtors.

Reduced to its just proportions, this agreement means that the several creditors who were entitled to the entire proceeds of the sale would not

require Cummings to pay them in cash, as he was bound to do by the terms of the sale; that they granted him time to pay; that he recognized their original mortgages and claims as still existing and operating against the property, and obligated himself, in case of his failure to meet the payments as stipulated, to interpose no objection or obstacle to the enforcement of their original claims and mortgages against Tucker Brothers, as if no such sale had been made by the sheriff. Without the intervention of Tucker Brothers, these creditors and Cummings agree that the mortgages and judgments which Cummings was bound to pay in cash, to the extent of the price of the adjudication, should not be paid or discharged, but should continue in force, notwithstanding the fact that the property of Tucker Brothers had been sold, and sold for cash, in satisfaction of these claims and mortgages.

It can not be pretended that the bank could ever, at any time after the seventh of September, 1867, have enforced their judgment against Tucker Brothers by execution or any other process against the mortgaged property which had been seized and sold under that judgment; and the moment the right of the bank to seize and sell that property under that judgment ceased, that moment the judgment lost its effect as a judicial mortgage with respect to that property, and the rights of the bank were narrowed down to the conventional mortgage of the twenty-fourth of February, 1860.

Third—There is proof in the record that one of the Tuckers and Daunis wrote to the bank acknowledging their indebtedness. We are dealing, not with a question of indebtedness, but with a question of mortgage; and a written acknowledgment of indebtedness does not create a mortgage.

It was also proven that Adams & Co., in November, 1874, offered to pay for the bank claim thirty per cent on the amount due seventh September, 1867. Adams & Co. stated in their letter that the bank held a concurrent or second mortgage for $6269 50 ; that the inducement for their offer was that Daunis was greatly embarrassed, his property mortgaged for more than its value, and that they were mortgage creditors, and were desirous to have the place kept up as a sugar plantation, " which can only be done by continuous and heavy advances." The utmost effect of this is to charge Adams & Co. with knowledge of the claims of the bank, without in any manner giving them additional force or enlarging their effect.

The jurisprudence of Louisiana seems now to be settled that there is no notice or knowledge of a mortgage by which a third person can be affected other than that which is afforded by inscription in the proper office. There has been some difference of opinion as to the correctness of this doctrine, and we think it not amiss to avail ourselves of this occa-

:sion to discuss the question somewhat as *res nova*, instead of contenting ourselves, as we might do, with a mere reference to the decisions of this court.

The Civil Code as originally adopted, article 3314, declared that "mortgages are only allowed to prejudice third persons when they have been publicly inscribed on records kept for that purpose, and in the manner hereafter decreed."

Article 3315 defined the words *third persons*, as used in the preceding article, to be "all persons who are not parties to the act or to the judgment on which the mortgage is founded, *and who have dealt with the debtor either in ignorance or before the existence of this right.*" Under the dominion of this article there was room for the opinion that knowledge supplied the place of inscription.

The act of 1855, No. 274, section two, declares that all sales, contracts, and judgments affecting immovable property which shall not be recorded in the parish where the property is situated "*shall be utterly null and void, except between the parties thereto.*"

The constitution of 1868, article 123, provides that "no mortgage or privilege shall hereafter affect third persons, unless recorded in the parish where the property to be affected is situated."

The act of 1855 is re-enacted in the Revised Statutes of 1870, sections 3188, 3189 ; and it is embodied in the Revised Civil Code of 1870, articles 2264, 2265, and 2266.

Article 3342 of the Revised Code is a copy of article 3314 of the former editions ; but article 3343, which takes the place of the original article 3315, has modified the definition of *third persons* remarkably. It reads thus : .

. "By the words *third persons*, used in the foregoing article, are to be understood all persons who are not parties to the act or to the judgment on which the mortgage is founded," omitting the last clause, the words which follow "founded" in the original article, as follows : "*and who have dealt with the debtor in ignorance, or before the existence of this right.*"

There can be no doubt that the intention of the law is as declared in the act of 1855, new article 2266 of the Code, in the constitution, art. 123, and in article 3347 of the Code, that a mortgage not recorded in the parish where the property to be affected is situated is utterly null and void, except between the parties thereto.

The inscription, therefore, is as essential to the validity of the mortgage, except between the parties to the act, as the mortgage is to the validity and effect of the inscription. If the inscription loses its effect, as it may by the lapse of time, the mortgage ceases to have effect, except between the parties.

Article 3333 of the original Code was as follows:

"The registry preserves the evidence of mortgages and privileges during ten years, reckoning from the day of *their* date; *their* effect ceases, even against the contracting parties, if the inscriptions have not been renewed before the expiration of this time, in the manner in which they were first made."

The act of 1843, already referred to, amending this article, makes it the duty of the recorders, on the simple application in writing of the owner, creditor of the owner, or other party interested, to cancel and erase all inscriptions of mortgages which have existed or may exist on their records for a period exceeding ten years without a renewal of such inscription. Revised Statutes, sections 450, 3141.

There was some doubt, as the law then stood, whether the mortgage lost its effect by the lapse of ten years from its date, or whether it was the inscription which was thus perempted.

Article 3369 of the Revised Civil Code takes the place of article 3333, and it changes the phraseology of the original article:

"The registry preserves the evidence of mortgages and privileges during ten years, reckoning from the day of *its* date (not *their* date, as in the original); *its* effect (not *their* effect, as in the original) ceases, even against the contracting parties, if the inscriptions have not been renewed before the expiration of this time, in the manner in which they were first made."

The ten years are to be reckoned, not from the date of the *mortgage*, but from the date of the *inscription*, and the effect of the *registry*, not of the *mortgage*, ceases against the contracting parties, etc. One of the effects of the registry, so long as it exists, is that it preserves the evidence of the mortgage or privilege; but when the ten years from the date of the inscription have expired without reinscription before that time, the registry no longer affords proof of the mortgage or privilege, even as against the contracting parties. As the mortgage is utterly null and void, except between the parties, without inscription, it can have no effect whatever as to all other persons after the expiration of ten years without reinscription before that time has elapsed.

Whether this be in accordance with the registry laws of other States, or the decisions of other and the most authoritative and respectable judicial tribunals elsewhere, it is not material to inquire. In most of the States the chief if not the sole object of registry is to give notice, to afford certain means of knowledge to those who may be affected by the contracts which are required to be recorded; and under such a system it may well be held that knowledge, as it is the accomplishment of all that the registry could possibly effect, supplies its place and makes it unnecessary.

Under our system, the registry preserves the evidence of the mortgage. Without it the mortgage is utterly null and void, except between the parties thereto. The language of the law is plain; and it is not possible to avoid the conclusion that nothing supplies the place of registry, or dispenses with it, so far as those are concerned who are not parties to the mortgage; and that when ten years have elapsed after the inscription without reinscription before that time, those who are not parties to the mortgage may safely contract with the mortgager as if no such inscription had ever been made; and they may acquire mortgages on the same property, from the same mortgager, which will outrank all previous mortgages the inscriptions of which have lost their effect by the lapse of time.

On the second of April, 1870, the date of the mortgage under which John I. Adams & Co. claim, more than a month had elapsed after the inscription of the mortgage under which the bank claims had lost its effect. The mortgage in favor of Adams & Co. outranked that mortgage; and, whatever effect the latter may have had during the ten years after the twenty-fourth of February, 1860, it could have had none, except between the parties thereto, after the expiration of that time.

The sale of mortgaged property under execution, for cash, in satisfaction of the mortgage debt, must release and discharge that property from the operation and effect of that mortgage; and neither the conventional nor the judicial mortgage in favor of the bank had any real existence, so far as the property originally affected by them was concerned, after the sale of that property on the seventh of September, 1867.

Counsel for appellant suggest that the agreement of seventh of September, 1867, was not discussed in the court below. We find that it was introduced in evidence by them; and we do not see how the judge could have avoided giving it the effect to which it was entitled, or deciding that it had not the effect claimed for it. It is clearly not a mortgage; and if it appears as a mortgage in favor of the bank it should be canceled and erased, so far as the bank is concerned, under the judgment making the rule absolute.

Our conclusion is that all the mortgage rights which the Bank of New Orleans had with respect to the property in question have long since been extinguished; and the judgment appealed from is therefore affirmed with costs.

The labor of examining this voluminous and closely-written transcript has been greatly increased by the failure of the clerk to observe the first rule of this court, adopted thirty-first of May, 1869. Some long documents have been copied more than once, and the index, of several pages, is merely a reference to the papers and proceedings in the case in the order in which they appear in the transcript, without even an attempt at

alphabetical arrangement. We think this a proper occasion to call the attention of the clerks to this rule, and to notify them that they incur the risk of having to pay the costs of putting the transcripts in proper order, and of arranging the indexes, where they fail to observe the rule of the court in that respect.